Syllabus.

No. 2904.

Bud Woods v. The State.

1. Practice—Challenge to the Array of the Grand Jury.—Article 377 of the Code of Criminal Procedure provides that "any person, before the grand jury have been impaneled, may challenge the array of jurors or any person presented as a grand juror, and in no other way shall objection to the qualifications and legality of the grand jury be heard."

2. Indictment—Abatement.—Article 523 of the Code of Criminal Procedure, which controls the subject, expressly provides that an indictment can be set aside only because of one or both of the causes enumerated, i. e.: that the indictment was not found by at least nine grand jurors, or that some person not authorized by the law was present when the grand jury were deliberating upon the accusation against the defendant or were voting upon the same. Independent of the said statutory grounds, jeopardy and want of jurisdiction are the only other grounds upon which an indictment can be vacated or avoided.

3. Same—Case Stated.—The defendant pleaded in abatement to the indictment that one of the persons who served as a grand juror and found the same, having been convicted for felony, and never having been pardoned, was incompetent and disqualified, and on this appeal contends that the question thus raised is necessarily a jurisdictional question, because if, by proof in support of his plea, he should show the grand juror to be disqualified, then it would appear that the indictment was not presented by a constitutional grand jury of twelve, and was therefore a nullity and would not support jurisdiction. But *held* that, waiving the merits of the question as raised, the proof fails to support the allegation of the plea, and the same was properly overruled. Note the opinion for the suggestion that, upon the facts set up in the plea in abatement, the better practice would have been to move, under the second ground enumerated in the statute, to set the indictment aside.

4. Practice—Theft—Driving Stock From Range, Etc.—A conviction for driving stock from its accustomed range with intent to defraud the owner, etc., whether the punishment assessed be a term in the penitentiary or the alternative one of fine, is a conviction for felony. In this case the defendant offered as a witness one A, who had been separately indicted for the same theft, and convicted of driving stock from its accustomed range, and his penalty affixed at a pecuniary fine. The State objected to the witness upon the ground that he was a convicted felon, and that he had not paid the fine assessed against him as penalty. The trial court sustained the objection, notwithstanding sentence had not been pronounced upon the judgment. *Held*, that, the penalty being a pecuniary fine only, the sentence was not essential to complete the conviction so far as to disqualify the witness, and the

trial court did not err in holding him incompetent. Moreover, though separately indicted, the proposed witness was indicted as a principal to the same offense, and unless he had been acquitted was not competent to testify in behalf of the defendant. Note that Hurt, Judge, concurring in the ruling as to the incompetency of the proposed witness, dissents as to his conviction for driving stock from the range, etc., with penalty assessed at a pecuniary fine, being a conviction for felony.

5. SAME—CONSENT—CHARGE OF THE COURT.—The indictment alleged the ownership of the animal to be in C and A and R, and that the same was taken without the consent of C or A or R, or either of them, which correctly alleged the want of consent. The trial court charged the jury to convict if they found that the defendant took the animal without the consent of C or A or R, or either of them. *Held*, fundamental error inasmuch as it was equivalent to an instruction to convict if any one of the parties did not consent, notwithstanding either or both of the other two may have consented.

APPEAL from the District Court of Williamson. Tried below before the Hon. John C. Townes.

The appellant was convicted of the theft of a horse under an indictment, the charging part of which reads as follows: "* * on or about March 20, 1886, in said county and State, did then and there unlawfully and fraudulently take, steal and carry away a certain horse, the same being the corporal personal property of James E. Robertson, but the same being then and there an estray, and having, theretofore, been taken up and advertised as an estray by A. H. Ash, a county commissioner of Williamson county, Texas, and having been placed by said Ash in the possession of one D. W. Clifton, who was then and there holding the same for said Ash and said owner, the said horse being then and there taken from and out of the possession of the said D. W. Clifton, without the consent of the said Clifton, or the said Ash or the said Robertson, or either of them, and with the intent then and there, on the part of the said Bud Woods, to deprive the said Robertson of the value thereof, and with intent to to appropriate it to the use and benefit of him, the said Bud Woods, against the peace and dignity of the State."

James E. Robertson was the first witness for the State. He testified that his name was James E. Robinson, but was equally well known by the name of James E. Robertson. He had lived in Williamson county, near Rice's crossing, for forty years, and had known the defendant for fifteen years. For thirty years past the witness had been in charge, care, control and manage-

ment of the stock of horses in the C brand, which said stock ran in Williamson county. The said stock belonged to the estate of Alfred Smith, deceased. Mr. Smith died in Austin, Texas, in 1883, prior to which time the witness held the possession of the said horses under authority from Mr. Smith. Soon after the death of Mr. Smith, his son-in-law, R. M. Castleman, placed the witness in continued charge of the said stock, pending the division of the estate, and executed his power of attorney to witness, which the State now placed in evidence. The property of the said estate was divided in the summer of 1885, when Castleman, as the guardian of the minor Alfred Smith, continuing the witness in the care of the said stock, executed to him the power of attorney, which, at this point, the State read in evidence, and it was under this power of attorney that the witness was holding the stock at the time of the alleged theft. The witness's right to manage and control the said stock of horses under the said powers of attorney was never questioned by any person, and was never objected to by the heirs of Alfred Smith. No person other than witness had any authority to manage or control, or in any manner to interfere with, any of said stock, and the witness had no power to sell any of it. The animal charged to have been stolen by the defendant, and for the theft of which he was now on trial, belonged to the estate of Alfred Smith, deceased. It was the colt of a mare that witness had known for fifteen years. He had often seen that horse suck that mare. The said horse was delivered to the witness by County Commissioner Ash and Mr. Clifton as the horse taken by them from the possession of the defendant, and as the horse which had been previously estrayed by Mr. Ash. The witness never consented for the defendant or anybody else to take that horse. Defendant came to witness in May or June, 1886, to buy the animal. He did not then tell witness that he had ever had the animal in his possession. He merely described the animal, which, he said, was running on Brushy creek, near Adams's pasture. He told witness that he wanted to buy it, and witness referred him to Mr. Castleman. A few days later the witness learned of the arrest of the defendant for the theft of the animal. The description of the animal as given by the defendant corresponded with that of the animal delivered to witness by Ash and Clifton, and which is the animal mentioned in the indictment. Witness recovered the animal in June, 1886.

Lee Ross, the next witness for the State, testified that he and the defendant were brothers-in-law, each being married to a daughter of Green Adams. The witness first saw the horse mentioned in this indictment about November 15, 1885. Witness was at the house of Green Adams, in Williamson county, on the said day, and while he was there the defendant and Mitch Adams left the house together, on foot. When they returned, about an hour and a half later, the defendant was leading the horse mentioned in the indictment. When they reached the lot, the witness being then at the lot, the defendant traded the said horse to Mitch Adams for a horse which the said Mitch then owned. On the morning after the said trade Mitch Adams put the horse he got from the defendant in William Pflueger's pasture, which pasture was near the Green Adams place. The horse remained in the said pasture until the arrest of the defendant in May or June, 1886. The witness was at Green Adams's place on the day before the filing of the complaint against the defendant for the theft of this horse, and on the day before the arrest of the defendant he met and talked with D. W. Clifton. Clifton came to see witness about the said horse. He asked the witness where the animal was, and witness told him that it was in Pflueger's pasture. On or about Christmas, 1885, the witness and defendant being on their way to their homes from Round Rock, got into a conversation about the horse defendant traded to Mitch Adams. Defendant then told the witness that the said horse was or had been an estray, and that he got him on the Gabriel, in Williamson county, Texas. On the night of the arrest of the defendant, Messrs. A. H. Ash, D. W. Clifton and W. H. Lockhart came by witness's house, having in charge the defendant and the horse which, in November, 1885, the defendant traded to Mitch Adams, and which Mitch Adams put in Pflueger's pasture.

Cross examined, the witness said that he came to Texas from Hawkins county, Tennessee, sixteen years ago. He went back to Tennessee about five years ago. He had never gone under any other than his real name, which was Lee Ross. He had been married twice, his wives being sisters, and each the daughter of Green Adams. Witness had never passed under an assumed name, and was not a fugitive from justice. He was once accused of forgery by the defendant, who charged him with unlawfully signing W. D. Cox's name to an order. There was no foundation for the charge, as he wrote the order in Cox's

name, and signed Cox's name, at the special instance and request of Cox, who was present and saw him do it. When defendant was arrested on this charge he told the witness that if he testified against him on this trial he would prosecute the witness for forgery, and that he and his "niggers" would swear to anything to send the witness to the penitentiary. Mitch Adams was present and heard defendant make that statement. Up to about that time the witness and defendant had been quite friendly, but they then "fell out." They subsequently became reconciled, and remained upon terms alternately friendly and otherwise until January, 1887, term of the district court of Williamson, when they quarreled, and had not since spoken to each other.

Re-examined by the State, the witness stated that the nature of his feelings towards the defendant could not influence him to swear falsely to secure the conviction of the defendant. Since the witness had been understood to be a State's witness in this case, he had been twice arrested at the instigation of the defendant—once for the felonious theft of property, and once for horse theft. His innocence, however, was so palpable that the grand jury in both instances refused to present bills against him. On one occasion the defendant threatened that if witness did not testify in his behalf on this trial, he would send witness to the penitentiary. On another occasion he offered the witness one hundred dollars to swear that the horse he, defendant, traded to Adams was another animal than the one delivered by Ash and Clifton to Robinson. On another occasion he offered to pay the witness's appearance bond as a witness, if witness would leave the country and not testify in the case, the said bond being in the sum of two hundred dollars.

Re-cross examined, the witness said that he knew Bill Weaver, but denied that, in Purl's saloon, in Georgetown, Texas, in January, 1888, or elsewhere or at any other time, he offered the said Weaver fifty dollars to swear on this trial that the defendant traded the stolen horse to Mitch Adams. Witness had a talk with Weaver, in the course of which Weaver said that he had seen defendant rope horses. Witness then asked him what he was going to testify on this trial. He replied: "Oh, hell! If I can't do a man any good, I won't do him any harm." This conversation occurred in Georgetown during the preceding term of the district court. Mitch Adams was tried at that term of the court for this same offense, and, on that trial, the witness

testified as he has testified on this trial. The witness met Bill Weaver in Taylor in the fall of 1887, and had a talk with him about this case, and did say to Weaver that he thought defendant ought to go to the penitentiary for the theft of this horse. He also told Weaver that defendant had been intercepting and opening his, witness's, letters, and that he was going to have defendant punished for doing so, if he could. He did not, however, tell said Weaver on that occasion that defendant had been doing him "dirt," and that he was going to send the defendant either to the penitentiary or to hell.

Albert Craft was the next witness for the State. He testified that he lived in McLennan county, but in 1887 lived on Brushy creek, in Williamson county, near the defendant's place. After his arrest for the theft of the Robinson horse, the defendant came to see witness, and attempted to persuade witness to testify, on this trial, that he, witness, was at Green Adams's place when the defendant traded the horse to Mitch Adams, and that the horse he traded to Mitch Adams was not the horse that A. H. Ash and D. W. Clifton afterwards got out of Pflueger's pasture and delivered to James E. Robinson. The defendant at that time well knew that witness was not at Green Adams's place at the time of the said trade, and knew nothing whatever of the transaction. He offered witness, in consideration of such testimony, pay for his time, and a horse to ride.

Cross examined, the witness said that prior to his removal to McLennan county he lived at the house of Bud Hudgins, who was his brother-in-law; which house was near Georgetown, in Williamson county. Bud Hudgins was now serving a term in the penitentiary for cattle theft. Prior to his residence at Hudgins's witness lived on the place of Mrs. S. C. Elliott. He worked for defendant in March and April, 1886. Witness had known the State's witness Lee Ross for about four years. Ross was with the defendant when the latter, in June, 1886, came to witness's house in McLennan county, to get witness to testify in his behalf on this trial. This visit was paid to witness a very short time after the arrest of the defendant on this charge. Ross and defendant appeared to be friendly at that time, and Ross heard all that defendant said to witness about the case. Upon defendant's offer to furnish witness a horse to ride to Georgetown, and to pay him for his time in attending this trial, the witness agreed to attend the trial, but made no agreement whatever about swearing or testifying on the same. He was

present at the July, 1886, term of this court, under a subpœna which issued in behalf of the defendant. At the time that defendant visited the witness in McLennan county he was under indictment for this offense and was on bail. Witness and Lee Ross discussed this case over, but that was after the witness had told the district attorney what he knew about it. It was the witness's recollection that, in 1886, he had some talk with Mrs. Elliott about this case. That conversation took place at Mrs. Elliott's house. Witness did not tell Mrs. Elliott in that conversation that he was a good witness for the defendant about the horse transaction, and that defendant knew it; that, defendant refusing to pay him a debt he owed him, he, witness, had intended to go to Canada, but as by that means he might get into trouble, and as Lee Ross was his friend, he had decided to stay and testify in behalf of said Ross. Witness told Ross that he was not going to try to help defendant out of this trouble, but that he was going to tell the truth, whether it hurt or helped the defendant. There had been no trouble between the witness and defendant. The witness and defendant stole three of Ben Ray's ducks, one of which the witness got, the defendant getting the other two. When the theft of the ducks became known the witness, in company with Lee Ross, went to see Ben Ray about the ducks, and agreed to pay him for the same, and afterwards did pay him for all of the ducks. Witness decided to tell the whole truth about the duck transaction because he ascertained that defendant attempted to fasten the whole responsibility of the theft upon him. Defendant was present when witness paid Ray for the ducks, and heard witness tell Ray that he would pay for all of the ducks without regard to who took them.

D. W. Clifton testified, for the State, that he lived in Williamson county, about seven miles distant from Georgetown. He knew the defendant and the horse involved in this prosecution. He knew that animal as the colt of a "C" mare which he often saw on the range near Burris's Knob, in Williamson county, Texas. The said mare had run on that range for two or three years at the time the animal involved in this controversy was foaled. The Burris Knob range, on which the said mare and colt ranged at the time referred to by witness, was near the witness's place, and between fifteen and twenty miles distant from Rice's crossing where James E. Robinson lived. Upon the suggestion of the witness, County Commissioner Ash,

in the spring of 1885, estrayed the said mare and colt, and placed them in the care, management and possession of the witness. The said animals remained on the range in the witness's possession until the fall of 1885, when the colt disappeared. It was taken from the possession of witness, who was holding it for Ash as county commissioner and for the owner. It was taken without the knowledge or consent of the witness. The witness found the said horse in the spring of 1886 in Pflueger's pasture, which was near the house of the defendant. The defendant was arrested on Monday. On Sunday, the day preceding the arrest, the witness went to the house and neighborhood of Green Adams, the father-in-law of the defendant, and spent that day hunting for the horse throughout that and the neighborhood in which defendant lived. He could not say that defendant knew what his business in the neighborhood was. Through Stephens, and again through Lee Ross, the witness on the said Sunday learned that the animal was in Pflueger's pasture. He went to that pasture on the same day and found the animal in the same. Next morning he went to Round Rock and made complaint against the defendant and Mitch Adams for the theft of the horse. In company with Ash and Constable Lockhart the witness, on the same day, returned to Pflueger's pasture to get the horse, intending also to go by and arrest the defendant Adams. Arriving at Pflueger's pasture they found the horse on the outside of the pasture, trying to get into it at the gate. They turned the horse into the said pasture and then penned and caught it. The horse referred to by witness was the same horse that was estrayed before Commissioner Ash, and was afterwards pointed out to A. G. Telfer, who kept Pflueger's pasture, and that was finally claimed and proved away from witness by James E. Robinson as the agent of the Smith estate.

A. H. Ash, county commissioner in 1885–6, for precinct number four of Williamson county, Texas, testified, for the State, that the horse involved in this prosecution, together with its dam, was reported to him for estrayal, in the spring of 1885. Witness estrayed the said animals in the manner provided by law, as shown by the records of the county clerk's office, introduced in evidence at this point by the State. The said animals at that time were running at large on the range near D. W. Clifton's house, and witness placed the same in the range pos-

session of the said Clifton. In May, 1886, Clifton reported to the witness that the horse had been taken from the range by the defendant and Mitch Adams, and that it was then in Pflueger's pasture. On the next morning (Monday) the witness, with Clifton and Constable Lockhart, went to Pflueger's pasture to get the horse. They did not find it in the pasture, but when they reached the gate and were leaving the pasture, they found it on the outside trying to get in. Witness and his party then penned the animal and caught it, and showed it to Mr. Telfer, who had charge of the pasture. That horse was afterwards proved away by, and delivered to James E. Robinson as the agent of the Smith estate. The said horse was taken without the knowledge or consent of the witness.

Mrs. Mattie Ross testified, for the State, that she was the wife of the State's witness Lee Ross, the daughter of Green Adams, and the sister of Mitch Adams and of defendant's wife. On the morning of the day on which the defendant was arrested for the theft of the horse described in the indictment, the witness's brother Mitch brought the said horse from Pflueger's pasture to, and put it in a lot at, Green Adams's place, whence the defendant immediately took the same, led it through Adams's pasture and released it on the range, which said range was near Pflueger's pasture. Witness had no ill feeling for the defendant, and appeared at this trial only to tell the truth. She lived two or three miles distant from defendant, but had not seen him until this trial (August, 1888) since February, 1888. She had not seen the defendant's wife (her sister) to speak to her since Christmas, 1887.

A. G. Telfer testified, for the State, that he lived in and had control of Mr. William Pflueger's pasture in Williamson county, Texas. The horse which was taken out of Pflueger's pasture in May or June, 1886, by Ash, Clifton and Lockhart was placed in that pasture about six months before, since which time, until the Monday morning it was taken by Ash, Clifton and Lockhart, it had never been outside of the pasture. It was in that pasture on the preceding Sunday evening. Witness did not know who put the horse in the pasture nor who turned it out on the Monday morning that Ash got it.

Constable Lockhart testified, for the State, that he went with Ash and Clifton to Pflueger's pasture in May or June, 1886, to get the horse mentioned in the indictment. They found that horse outside the pasture at the gate trying to get in. They

then penned and caught the horse and showed it to Telfer. They then went to the defendant's house and arrested him. During the January, 1888, term of the district court the sheriff of Williamson county, upon the forfeiture of the defendant's appearance bond, sent witness and others to defendant's house to arrest him. The weather at that time was extremely cold, the ground being covered with ice. Diligent search of the neighborhood failed to discover the defendant. Witness afterward made another unsuccessful search for the defendant. Each of the searches referred to was made at night.

I. W. Lane, clerk of the district court of Williamson county, testified, for the State, that, when the defendant's case was called at the January term, 1888, of the court, a certificate from a physician was presented, from which it appeared that the defendant was at home, confined to his bed by sickness, and was unable to attend court. The defendant's appearance bond was then forfeited, and by direction of the court the witness issued an alias capias and delivered it to the sheriff.

Deputy Sheriff F. I. Fisher testified, for the State, that he was in attendance upon the court at the January term, 1888, when the defendant's appearance bond was forfeited. Alias capias was then delivered to witness, and he, with other deputy sheriffs, went to the defendant's house, arriving after midnight. Diligent search of the house and the neighborhood failed to discover the defendant. The weather was then bitterly cold. A few days after the adjournment of court the defendant came to jail with his father-in-law, Green Adams, and voluntarily surrendered.

Sheriff Olive testified substantially as did Deputy Sheriff Fisher, except that he did not go to the defendant's house to serve the alias capias.

The State closing, Mrs. S. C. Elliott was called to the stand as the first witness for the defense. She testified that she knew the State's witness, Albert Craft. The said Craft lived at witness's house during February and March, 1886, during which period she had several conversations with him about the defendant. In the presence of the witness's son Dave, the said Craft told witness that he intended to go to Canada to see his people, but that he could not get defendant to pay him what he owed him; that he was a good witness for defendant, and was afraid that if he left the defendant would attempt to fasten the theft of the horse on Lee Ross, who was a good friend of his,

Craft's, and that he had decided to see Craft out of the trouble. Dave Elliott corroborated the testimony of his mother.

Bill Weaver testified for the defense, that during the January term, 1886, of the district court of Williamson county, he met the State's witness, Lee Ross, in Purl's saloon, in Georgetown, on which occasion Ross offered to pay him fifty dollars to testify that he, witness, saw defendant trade the horse to Mitch Adams at the time and place stated by said Ross on this trial.

Will Munn testified, for the defense, that, in December, 1887, he met Lee Ross in Taylor, Texas, on which occasion the said Ross told him that defendant had done him dirt, and that he intended to send the defendant either to hell or the penitentiary.

Ben Ray testified, for the defense, that on one occasion the State's witness Craft came to him and told him that he had stolen three of his, witness's, ducks, of which he, Craft, got one and the defendant two. Afterwards the defendant, in witness's presence, asked Craft why he connected him, defendant, with the theft of the ducks, when Craft admitted that defendant had nothing to do with the theft of the said ducks, and offered to and did pay the witness for the ducks. Witness heard Craft testify on this trial. His testimony about the duck transaction was substantially correct.

Green Adams and his wife, the father and mother of Mattie Ross and the defendant's wife, testified, for the defense, that it was not true, as testified by Mattie Ross, that, on the morning of the day of the arrest of the defendant, the defendant and Mitch Adams took the said horse from Pflueger's pasture and turned it out on the range. Defendant was not at the witness's house on that day, and had nothing to do with the horse on that day. Mitch Adams did not get the horse from Pflueger's pasture on that day.

On cross examination, Green Adams said that defendant and Mitch Adams went to the house of James E. Robinson for the purpose of buying said horse on the day of defendant's arrest, and that the arrest was made after the defendant got back from Robinson's.

Ben Ray, C. C. Bradford, Robert Murray, W. T. Cox, H. W. Miller, J. C. McMichael, J. H. Osborne, J. W. Blackman and W. H. Woods each testified, for the defense, that they had known the State's witness Lee Ross for several years, during which time they knew that his general reputation for truth and veracity was bad.

No brief on file for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State: Upon the trial of this cause appellant filed a plea in abatement, based on the alleged disqualification of one of the grand jurors who presented the bill of indictment against him; which plea was overruled by the trial court. The bill of exception does not make the alleged disqualification to appear. In fact, the whole bill is not clear on the matters set out. It does not show the indictment upon which the juror was tried and convicted, but alleges that it was burned, and that it on trial was agreed that the same was so burned. The difficulty here is this: the offense charged in the burned indictment is not set forth in the bill of exception. The verdict does not set forth the offense charged in the indictment, nor does the verdict set forth the offense of which the said juror was convicted. The judgment returned does not set forth the offense charged or of which the the juror was convicted.

There is a recognizance in the bill reciting the offense to be "removing cattle from their accustomed range with intent to defraud." It does not appear what was the result of the appeal. If affirmed, it does not appear that a sentence was pronounced, and there is no final judgment that can be enforced. The conviction of the juror took place in 1873 under the old law. If said juror was convicted under article 766a of the Penal Code (Pas. Dig., art. 2410b,), then it was a felony, and he could not appeal by giving a recognizance.    (Pas. Dig., art. 3185.) The offense denounced by article 2410b of Paschal's Digest was a felony and is still a felony.    (Pas. Dig., art. 56; Campbell v. The State, 22 Texas Ct. App., 262; Guest v. The State, 24 Texas Ct. App., 530.) The punishment was by imprisonment in the penitentiary, or by fine in the alternative, and this constitutes a felony.

If a felony, then the recognizance was void. It does not aid appellant in proving the conviction, of the juror, of a felony, but goes to prove, if anything, that he was convicted of a misdemeanor. However this may be, I submit that the recognizance can not be looked to to determine the guilt of a party, or to fasten upon him the odium and infamy of conviction that attaches in that event to disqualify him from sitting on juries. The proof of infamy, and of a legal conviction, can not be made by proof of a recognizance and the recitation therein of a crimi-

nal charge against a party.   Besides, the recognizance only shows that the juror was charged with the named offense therein set out.   It does not set forth that he was convicted at all of any offense, or of the offense recited therein.   Again, the verdict is too uncertain to show anything, or to throw any light on the matter, at all.   It recites that defendant was convicted "under the first count in the indictment," and was fined eight hundred dollars, and that is all it does recite.   This verdict, as presented, throws no light on the matter.   It is too uncertain to prove that defendant was a convict, and therefore infamous. The judgment recovers of the juror eight hundred dollars, and that is all it recites.    There is nothing to show that the juror was convicted of a felony, nor does the sentence state the offense.   There is no sentence in the record.   At that time the sentence could not be pronounced till after affirmance, if an appeal was taken.   (Pas. Dig., 3148.)  If no appeal was taken, then sentence could not be passed until two days after verdict. (Parrish v. The State, 45 Texas, 51; Pas. Dig., arts. 3147, 3136 and 3141.)   There is nothing to show that the juror was ever convicted, or even charged, with a felony.

When a party is sought to be rendered incompetent as a juror, or as a witness, a legal conviction must be shown to have taken place against him, of a felony.   Presumption can not be indulged in to make a citizen of Texas a legal felon.  If he is a legal felon, the record should show it, and if the records are destroyed then proper proof must supply the missing record proof, if it can be supplied at all.   I doubt if it could be supplied by oral testimony.   (Cooper v. The State, 7 Texas Ct. App., 194; Perez v. The State, 10 Texas Ct. App., 327; Perez v. The State, 8 Texas Ct. App., 610.)   Until the legal conviction occurs there is no disqualification.   (Arcia v. The State, ante, 193.)

If the appellant had the right to prove the charge in the indictment in the first count thereof, and that it was a felony, he did not do so.   It was admitted that the indictment was burned, but its contents are not admitted, nor proven, nor sought to be proven, nor set out in the record.   The plea in abatement, if properly pleaded, was properly overruled.   This will dispose of the plea, as I view it.

There is another view of this matter, as to the objection to the said grand juror, and it is this—that an indictment can not be abated in the first place, and in the second place all objections

to grand jurors must come by way of challenge. (Code Crim. Proc., arts. 380–381; Willson's Crim. Proc., sec. 1902.)

In the third place the abatement plea was but a challenge to the array, and can not be made after indictment found, as a means of quashing the indictment, and the disqualification set up is not a ground for challenge to the array. (Code Crim. Proc., art. 380.) Challenge to the array must be made before impaneling the grand jury and only for the two causes specified. (Code Crim. Proc., art. 380.)

The appellant offered as a witness one Mitch Adams to prove matters and things tending to exonerate appellant, or, at least, it is sought to make it appear that the testimony was of a material character. The State interposed the objection, and it was sustained, to the witness testifying that he was incompetent because of his conviction of a felony, and because he had never paid the fine of seven hundred and fifty dollars assessed against him, and was indicted for the same offense as appellant. The defendant duly excepted because the proof, as offered, did not show that said Adams had ever been sentenced, and was not, therefore, a disqualified witness. The exception was overruled and bill reserved.

The judgment reads as follows (after setting out verdict): "and it is therefore considered and adjudged by the court that the defendant Mitch Adams is guilty of the offense of fraudulently driving a horse from its accustomed range, as found by the jury, and that he be punished as has been determined by the jury, by a fine of seven hundred and fifty dollars. It is therefore ordered, adjudged and decreed by the court that the State of Texas do have and recover of and from the said defendant, Mitch Adams, the sum of seven hundred and fifty dollars, and all costs in this behalf expended; that he be remanded into the custody of the sheriff until the same is paid in full, for which let execution issue." The indictment charged theft in one count and fraudulently receiving stolen property by said Adams in the second count. Then it is evident that Adams was convicted of a felony under article 749 of the Code. (See art. 54 of the Penal Code; Guest v. The State, 24 Texas Ct. App., 530; Campbell v. The State, 22 Texas Ct. App., 262.)

Adams had not paid the fine assessed against him by the court, and this rendered him incompetent as a witness. Where a defendant is jointly indicted with others, and has been tried and convicted, and whose punishment was fine only, he may

testify for the other defendants after he has paid the fine and costs. (Code Crim. Proc., art. 737.)

If this article was intended to apply to felonies and misdemeanors both, where only fine should be imposed, then the said Adams could not testify, because it is shown that he had not paid his fine. It makes no difference, I apprehend, that he and appellant were indicted in separate indictments for the same offense. It is not the joinder of names in the indictment, but the joinder in the offense, in connection with the other matters, that the statute means. (Taylor v. The State, 3 Texas Ct. App., 169; Code Crim. Proc., art. 731; Myers v. The State, 3 Texas Ct. App., 8; Myers v. The State, 8 Texas Ct. App., 321; Rutter v. The State, 4 Texas Ct. App., 57.) Article 73 of the Code of Criminal Procedure bears out this idea and so says.

If article 737 does not apply (and I take it that it is immaterial whether it does or not), then article 731 does apply, because it is shown that Adams was indicted for the same offense as appellant, and the indictment was based upon the same transaction, and was for the same animal; and because it is shown that he was convicted, and not acquitted. This being the case, he could not be used by appellant as a witness in his behalf. (Code Crim. Proc., art. 731, and authorities cited.) Said article 731 reads thus: "Persons charged as principals, accomplices or accessaries, whether in the same indictment or different indictments, can not be introduced as witnesses for one another, but they may claim a severance; and if any one or more be acquitted, or the prosecution against them be dismissed, they may testify in behalf of the others."

This article, as to the disqualification prescribed, does not apply to witnesses produced in behalf of the State, but only to those who are produced in behalf of the defendant. The rule at common law, so far as the prosecution is concerned, has not been changed by this article as to the admissibility of such evidence. (Morgan v. The State, 44 Texas, 511; Warfield v. The State, 35 Texas, 736; Rutter v. The State, 4 Texas Ct. App., 57; Myers v. The State, 8 Texas Ct. App., 321; Meyer v. The State, 3 Texas Ct. App., 8; Rangel v. The State, 22 Texas Ct. App., 642.) Adams had been convicted for the same offense and for the same animal; and he had been indicted in a separate indictment and had been convicted as was appellant in this case, thus meeting every requisite of the statutory rule as laid down in article 731 of the Code of Procedure.

But appellant's objection that the witness had not been sentenced is presented. I think it immaterial whether a sentence had been pronounced or not, or whether the final judgment had been entered or not, as before shown under article 731 of the Code of Procedure. Viewing the law as I do, the judgment of the court, as hereinbefore set out, is a sufficient sentence and final judgment.

What is a sentence? "A sentence is the order of the court made in presence of the defendant, and entered of record, pronouncing the judgment and ordering the same to be carried into execution in the manner prescribed by law." (Code Crim. Proc., art. 792; Johnson v. The State, 14 Texas Ct. App., 306; Pennington v. The State, 11 Texas Ct. App., 281; Nathan v. The State, 28 Texas, 326; Mayfield v. The State, 40 Texas, 289.)

An examination of the bill of exceptions will show that the judgment has all the requisites of a final judgment, as required by article 791 of the Code of Procedure and the authorities above cited. Then said judgment is followed by the proper "sentence," or "order of the court," in sufficient compliance with article 792 of the Code of Procedure. No set form of words is necessary in making this order. The judgment and sentence were all entered at the same time, as shown by the bill of exception. It shows that Adams was present, and it orders the execution of the judgment of the court as prescribed by law. It was not necessary that the two days should elapse for Adams to file his motion for new trial and in arrest of judgment. Its entry prematurely was unimportant, as it did not affect the accused (Adams) injuriously. (Parrish v. The State, 45 Texas, 51.) It was not necessary, nor is it required, that the sentence should show that a defendant was asked if he had anything to say why judgment should not be pronounced. (Johnson v. The State, 14 Texas Ct. App., 306.)

Then the final judgment was fully in accordance with the statute, and the sentence or order therefor was fully in compliance with law, and its execution could be carried out as directed, without further order of the court. Adams did not seek to set aside this judgment by any of the motions of which he could avail himself, and he did not appeal. Then he became a convict, because of his conviction of a felony, and, accepting the terms given him, he did not resort to any higher court, and thereby he accepted the judgment and sentence of the trial court. (Penal Code, art. 27; Arcia v. The State, ante, 193.)

WHITE, PRESIDING JUDGE.  Appellant interposed a plea in abatement of the indictment upon the alleged disqualification and incompetency of one of the grand jurors who presented the bill, the ground of disqualification and incompetency of said juror being that he had, before sitting on said jury, been con-victed of a felony (Code Crim. Proc., art. 358, sub-div. 5), and had not been restored to competency by pardon or otherwise.

Our statute provides that " any person, before the grand jury have been impaneled, may challenge the array of jurors, or any person presented as a grand juror, and in no other way shall objections to the qualifications and legality of the grand jury be heard." (Code Crim. Proc., art. 377.)  Just after the adoption of our Code of Criminal Procedure, our Supreme Court, in the case of The State v. Vahl, 20 Texas, 779, held, in effect, that the provision above quoted abrogated the common law right, or the right theretofore existing, to attack the indictment on objection to the competency of the grand jurors by plea in abatement, and that the objections to such jurors could only be taken by challenge at the time of the organization of that body. In Hudson v. The State, 40 Texas, 12, it was held that objection that the grand jury was not legally constituted could not be availed of by motion in arrest of judgment, and it was further said in that case that " a challenge is not simply one mode of reaching the objection, but the statute declares in express terms that the objection shall be made in no other way."

In Owens v. The State, 25 Texas Ct. App., 552, where a simi-lar question to the one now before us was raised, we said:  " A plea in abatement to an indictment is not, technically speak-ing, provided for in our Code of Criminal Procedure.  There are two grounds, and only two, mentioned in our Code as sufficient on motion to set aside an indictment.  (Code Crim. Proc., art. 523.)  Independently of these two grounds, jeopardy and want of jurisdiction are the only other grounds known by which to avoid and vacate an indictment after its presentment."

Appellant's counsel contends and insists that the question he raises is necessarily a jurisdictional one, because, if it should appear on proofs of his plea that the juror was incompetent, then there were in fact only eleven grand jurors organized le-gally, and that, the indictment being found by a less number of grand jurymen than are required by the Constitution and laws, such an indictment was a nullity and would not support jurisdiction for trial and conviction.  (Lott v. The State, 18

Texas Ct. App., 627; Smith v. The State, 19 Texas Ct. App., 95.)
Suppose we concede the correctness of this position, then as
to this particular case, did the court err in overruling the plea
in abatement if treated as one to the jurisdiction?  We think
not.  The defendant's bill of exceptions, taken to the ruling of
the court, sets out all the evidence adduced in support of the
plea, but does not set forth the indictment upon which the
grand juror had been tried, and there is no positive proof that
he was tried and convicted of a felony, and such fact, if a
fact, is not made to appear clearly, but, if shown at all, is
only made to appear but very dimly and imperfectly.  Neither
the verdict nor judgment of conviction show affirmatively that
the grand juror had been tried and convicted of a felony.  The
plea was not supported by the evidence, and it was not error to
overrule it, even if such a plea could have been interposed to
the indictment.

Instead of a plea in abatement, it occurs to us that defend-
ant might, perhaps properly, under the facts contended for,
have moved to set aside the indictment in this case for the
reason that a "person not authorized by law was present when
the grand jury were deliberating upon the accusation against
the defendant, or were voting upon the same."  This ground
for setting aside an indictment is specially provided for by sub-
division 2 of article 523 of the Code of Criminal Procedure,
and under it defendant might have presented the question
raised, because, if the proposed grand juror was a convicted
felon, he would be a person unauthorized and incompetent to
be in the grand jury room whilst they were deliberating and
voting upon the finding of bills.

One Mitch Adams had been indicted by separate indictment
for the theft of the same animal charged to have been stolen
by defendant in this case.  He had been tried and convicted of
willfully and fraudulently driving said horse from its accus-
tomed range without the consent of the owner and with intent
to defraud the owner, and had been fined in the sum of seven
hundred and fifty dollars.  Defendant offered to introduce
Adams as a witness in his behalf, and the State objected to his
competency because, first, he was a convicted felon, and, sec-
ond, because he had not paid the fine assessed against him.
The objections were sustained, and the witness was not permit-
ted to testify.

It has been held by this court that willfully driving stock

from its accustomed range, with intent to defraud, etc., whether the punishment be imprisonment in the penitentiary or the alternative one of fine, was a felony. (Penal Code, arts. 54, 794; Campbell v. The State, 22 Texas Ct. App., 262; Guest v. The State, 24 Texas Ct. App., 530; Taylor v. The State, 25 Texas Ct. App., 96.) It is true, however, that ordinarily a party, under our present statutes, can not be held to have been finally convicted of a felony until sentence has been passed upon him. (Code Crim. Proc., arts. 793, 794; Arcia v. The State, ante, 193.) In this case, however, it was not necessary, perhaps, to pass sentence upon the defendant, inasmuch as his punishment was a pecuniary fine only. (Code Crim. Proc., art. 702.) Under such circumstances the court did not err in holding him incompetent by virtue of the judgment alone, it being for a felony, though no sentence had been pronounced. Adams had not appealed from said judgment, and our code declares that "an accused person is termed a *convict* after final condemnation by the highest court of resort which by law has jurisdiction of his case, and to which he may have thought proper to appeal." (Penal Code, art. 27.) The judgment rendered against him contains all the requisites of a final statutory judgment. (Code Crim. Proc., art. 791.) But the witness Adams was a principal offender in the same crime with defendant, though indicted separately, and unless he had been acquitted was not a competent witness for his confederate or coprincipal. (Code Crim. Proc., art. 731.) On this ground the court did not err in excluding him as a witness.

We are of opinion that fundamental error was committed by the court in its charge to the jury, and that for this reason, if for no other, the judgment should be reversed. In the indictment Robertson, Ash and Clifton were all connected by allegation with the ownership and possession of the animal charged to have been stolen. It alleged properly that the animal was taken "without the consent of the said Clifton or the said Ash or the said Robertson, *or either of them.*" This was altogether proper and necessary in order to negative the consent of each and all the parties deprived of the ownership and possession. But the court, in the charge to the jury, instructed them that if they believed beyond a reasonable doubt, etc., "that said taking (if any) was without the consent of the said Robertson, or Ash or Clifton *or either of them*   *   *   *   *   then you will find him guilty," etc. This is manifestly erroneous.

It was tantamount to charging them that they might convict if any one of the parties had not consented, though defendant might have had the consent of the other two. In other words, that the general and actual owner of the property might have given consent to defendant's taking, and yet he would nevertheless be guilty of the theft if either of the special owners had not given their consent.

For this error in the charge of the court the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 28, 1888.

HURT, Judge, thinks the witness Adams was incompetent because indicted and convicted for the same offense, but does not believe this conviction was for a felony, and that thereby he was rendered incompetent. He concurs in the opinion that the judgment should be reversed for the reason stated.